## IN THE UNITED STATES DISTRICT COURT
## FOR EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GORDON ROY PARKER**, a/k/a "Ray Gordon" a/k/a "Ray Gordon, Creator Of The Pivot," d/b/a Snodgrass Publishing Group,<br><br>                            Plaintiff<br><br>           v.<br><br>**Samuel H. Sloan,** 1664 Davidson Avenue, Bronx, New York, 10453; **William Goichberg,** 2084 Route 94, Salisbury Mills, NY, 15277; **Continental Chess Association,** P.O. Box 249, Salisbury Mills, NY, 12577; **Paul Truong,** Susan Polgar Institute For Chess Excellence (SPICE), Texas Tech University, Lubbock, TX  79409; **Susan Polgar,** SPICE, Texas Tech University, Lubbock, TX  79409; **Susan Polgar Foundation,** 103-10 Queens Boulevard, Suite #1C, Forest Hills, NY 11375; **United States Chess Federation,** 137 O'Brien Drive, Crossville, TN, 38555. **Joel Channing,** 5520 PGA Boulevard, Palm Beach, FL, 33418,<br><br>                            Defendants | CASE NO. 08     829 |

## COMPLAINT FOR DEFAMATION, TORTIOUS INTERFERENCE, FRAUDULENT AND NEGLIGENT MISREPRESENTATION, GROSS AND SIMPLE NEGLIGENCE, GENDER DISCRIMINATION UNDER TITLE VII AND THE PHRA, PUBLIC-INTEREST PHRA VIOLATIONS, LANHAM ACT VIOLATIONS, CIVIL CONSPIRACY, AND RICO CONSPIRACY

It is a sad day for organized chess in the United States.

### THE PARTIES

1.      Plaintiff Gordon Roy Parker, a/k/a "Ray Gordon," is an adult male resident of and domiciled in the Commonwealth of Pennsylvania.  His address is 4247 Locust Street, #119, Philadelphia, PA  19104.  He does business in the Commonwealth as Snodgrass Publishing Group.  Plaintiff has published several books on many topics, including chess and seduction (relationships etc.), under the name "Ray Gordon" through www.cybersheet.com.  He is also an experienced chess teacher who specializes in chess openings.

1

2.    Defendant Samuel H. Sloan is a resident of and domiciled in the state of New York.  He may be served at the address listed for him in the caption.

3.    According to his affidavit in <u>Sloan v. Truong et al.</u>, S.D.N.Y #07-cv-8537 (docket entry #16), Defendant William "Bill" Goichberg currently resides the address listed for him in the caption.  According to <u>Sloan</u>, Defendant Goichberg is currently staying at a "hotel [in] California."  Defendant Goichberg is the president of Defendant USCF, and sits on its Executive Board of Directors ("Board" or "Executive Board").  A copy of that affidavit is attached as Exhibit A and incorporated by reference as if stated verbatim.

4.    Defendant Continental Chess Association ("CCA") lists its only address as the postal box listed for it in the caption.  Plaintiff asserts that CCA is merely an alter-ego of Defendant Goichberg's, with no valid claim on a corporate veil.  Nevertheless, Defendant CCA may be served through Defendant Goichberg wherever he winds up served.

5.    Defendants Paul Truong and Susan Polgar (collectively, and for lack of a better-sounding term than "Trollgar," the "House of Truong") are now domiciled and reside in Texas, and can be served at the address listed for them in the caption, but have lived in Texas only since August 2007, apparently to avoid enforcement of a protective order in New York family court for Mr. Truong to stay away from Ms. Polgar's children, due to his and her having disciplined them through the forced injection of "hot sauce" for the children's refusal to study chess.  Prior to that, they resided in New York state, in Queens, New York.  Both defendants are members of the Executive Board of Directors ("Board") of Defendant USCF.  Defendant Polgar is its chairwoman.  They are both currently employed by the Susan Polgar Institute For Chess Excellence (SPICE), at Texas Tech.

6.    Defendant United States Chess Federation is an Illinois, nonprofit, 501(c)(3)

2

corporation, which is headquartered and can be served at the Crossville, Tennessee street address listed for it in the caption, or through any of its officers.

7.    Defendant Susan Polgar Foundation is a nonprofit chess organization run by the House of Truong, who can be served at the address listed for it in the caption. For these purposes, it is but an alter-ego of its founder, unworthy of the corporate veil, and her dreamed-of vehicle for replacing Defendant USCF. Defendant Polgar, on more than one occasion, has attempted to substitute her foundation for SPICE or USCF for chess-related money and power.

8.    Defendant Joel Channing is a resident of and domiciled in the state of Florida, and can be served at the address listed for him in the caption. He is also on the Board.

## NATURE OF ACTION

9.    This is an action for a) "defamation and injurious falsehood," which incorporates all forms of defamation: libel, false-light invasion of privacy, trade libel, misappropriation of likeness/right to publicity, b) tortious interference, c) fraudulent misrepresentation, d) negligent misrepresentation, e) simple negligence, f) gross negligence, g-h) retaliation discrimination under Title VII and the PHRA; i) failure to hire against the public interest in violation of the PHRA; j) Lanham Act violations; k) civil conspiracy; and l) RICO conspiracy.

## STATEMENT OF JURISDICTION

10.    Subject matter jurisdiction is proper under 28 USC §1331, due to the existence of federal questions, including RICO, the Lanham Act, and Title VII.

11.    Personal jurisdiction over all defendants is proper because, during the relevant times, all defendants are or were officers of Defendant USCF, who has at least several hundred paying members in Pennsylvania, and who regularly distributes hundreds of copies of its magazine, *Chess Life,* by mail to residents of the Commonwealth, and who sanctions

tournaments, including the World Open and National Chess Congress, from Defendants Goichberg/CCA, which are held in the Commonwealth.  Most or all of the defendants visit the Commonwealth at least once a year, during which time federation business is often conducted, formally or informally.  Philadelphia could easily be considered the "capital city of organized chess" in the United States.

12.   Personal jurisdiction over Defendants Goichberg/CCA is conferred through th tournaments they hold in Philadelphia each year, as outlined above.

13.   Personal jurisdiction over Defendants House of Truong/Susan Polgar Foundation is further conferred by the minimum contacts doctrine, specifically through their activities individually and through the foundation to conduct business with and solicit it from residents of the Commonwealth, including but not limited to USCF tournaments held in Philadelphia, as well as through their service on Defendant USCF's Board of Directors.

14.   As harassment is averred in this complaint, and the harm from any harassment (or incitement and/or identity theft) is felt by the recipient, with the damage occurring to the recipient, personal jurisdiction over all defendants is further conferred by Pennsylvania's long-arm statute.

15.   Personal jurisdiction is further conferred over Defendant Sloan by virtue of his conducting his chess and publishing business, Ishi Press, in Pennsylvania when he visits for tournaments, and through his website.  He has sold products to, or solicited their sale from, residents of the Commonwealth, as well as his being on Defendant USCF's Board during much of the times in controversy.

16.   Jurisdiction over all defendants for the RICO claims is conferred by 18 USC §1965(b), which authorizes "nationwide service of process," or service literally anywhere in the

United States.

## **BACKGROUND**

17.   Plaintiff incorporates by reference, verbatim, the contents of paragraphs 1-16.

18.   In August 2003, it was discovered that Defendant USCF was in serious financial difficulty, due to substantial operating losses, and the unexplained disappearance of $2 million in its Life Member Account (the money used to service life members, who pay a large one-time fee), that there were questions surrounding its pension fund, and that its once-profitable books-and-equipment business had gone from a $2 million annual surplus to a loss.

19.   The events of August 2003 left Defendant USCF extremely vulnerable to outside forces, particularly those looking to profit from its crisis.  Leading that pack was Defendant Goichberg, who, over time, assembled a supporting cast, a "crew" that included, but was in no way limited to, the several co-defendants, for the ultimate purpose of bankrupting Defendant USCF and plundering it, then profitably replacing it.  Defendant Goichberg's profitable tournament activities through Defendant CCA put him in the ideal position to lead this enterprise, and to dish out appropriate rewards to anyone who assisted him along the way.  His internet near-illiteracy (as evidenced by Defendant CCA's website) also made the unraveling of his plan inevitable, though doing so was still a tedious process.  It took Plaintiff well over one hundred hours to draft this complaint.

20.   In the process of executing his chess-world-domination scheme, Defendants Goichberg/CCA enlisted the help of Defendants Channing, House of Truong/Polgar Foundation, and Sloan, as well as "others who shall not be named" here.  Yet.  Defendant USCF's help was involuntary in nature, whether "enlisted" or not.

5

## Defendant Goichberg's Rise To Power: 2003-2005

21.   In 2003, Defendant USCF's voting policy was changed from allowing only member-delegates to vote, to "one member/one vote" ("OMOV"), forever changing the dynamics of USCF board elections. The general chessplaying public now had to be won over.

22.   In November 2003, Defendant Goichberg "volunteered" as the "office manager" for Defendant USCF. He did not take a salary, but wound up compensated after-the-fact for his work, which left him entrenched with enormous and unprecedented power over Defendant USCF's daily affairs, as Defendant Goichberg later joined Defendant USCF's board, and was elected president of Defendant USCF on August 14, 2005.

23.   Joel Channing was elected to Defendant USCF's Board, to a four-year term, in July 2005, and is still serving his term.

24.   It is not yet clear when Defendants Channing and Goichberg joined forces, but they are indisputably acting in concert at present. This was either planned or the result of a practicism, as Defendant Channing is a wealthy Florida real-estate developer and strong ally of Defendants House of Truong. Both factions have strong vested interests in organized chess.

25.   It is clear that Defendants Channing and the House of Truong have a longstanding alliance which predates his service. Soon after his election to the Board, Defendant Channing attempted to have Defendant Polgar installed as USCF president, but lacked the votes to make this occur. Defendant Polgar was instead given the honorary title of "Chairman."

26.   Defendant Goichberg, after installing himself as "volunteer office manager," made a "secret" payment to the House of Truong/Susan Polgar Foundation in the amount of $13,358.86 that was not unearthed until 2006, by Defendant Sloan.

27.   As detailed in Sloan v. Truong, in August 2003, after Frank Niro had apparently

6

embezzled money from Defendant USCF, thus triggering the financial scandal, Niro also allowed Defendants House of Truong to escape Defendant USCF's offices with a laptop computer that contained financial records vital to locating millions of dollars in "lost" and unaccounted-for money.  In March 2003, Frank Niro, on behalf of Defendant USCF, contracted with the House of Truong to train the 2004 women's Olympiad chess team, for a fee of $50,000.00.  The contract was eventually settled for $20,000.00, as it was improperly negotiated and unfunded  by a near-bankrupt Defendant USCF.

28.    After the 2005 Board elections, there were two friendly factions running USCF, one led by Goichberg, and the other by the House of Truong, with Defendant Channing as its point man.  It is at this point that these factions would merge, in a concerted and conspiratorial attempt to destroy USCF once and for all, for the purpose of plundering its assets and gaining power in its inevitable replacement.  As the only true remaining obstacle to this plan was "perennial gadfly" Defendant Sloan, he was enlisted to put the finishing touches on a plan which rivals any chess composition by those who share or exceed the impressive chessplaying strength of most parties to this litigation.

### The Plan To Destroy Defendant USCF: The Fake Sam Sloan (2005-2007)

29.    After the 2005 elections, the "Goichberg Mafia" was not pleased with its less-than-absolute power over Defendant USCF.  A plan was hatched to bring Defendant Sloan into the mafia fold, and to do so using the Board seat that Defendant Sloan had always craved as a lure.  The plan was simple:

a.    Sloan would run for the Board in 2006.  And win.

b.    Defendants House of Truong would impersonate Sloan on the internet leading up to and during the campaign, for the purpose of helping him gain sympathy with

voting public, while appearing to still be a pariah to the Goichberg Mafia.

      c.    Defendant Channing would act as intermediary in order to obscure any real or digital paper trails which might otherwise emerge involving Defendant Goichberg.

      d.    Upon Sloan's election to the Board, the imposter, eventually known as the "Fake Sam Sloan," would continue to impersonate Sloan until he got "caught," at which point Sloan would file suit, receive payoff in the form of an insurance settlement, be perceived as the hero, and have his questionable personal reputation obscured.  Female employees of Defendant USCF would be targeted with sexual harassment to ensure its demise in litigation, with (unsolicited) payoffs to the women.

      e.    Whether or not the 2005 elections were held just before or just after the imposter began posting is immaterial, as it was clear that Sloan was not going to win that year.

    30.   On or around October 6, 2007, USCF volunteer systems administrator Brian Mottershead released the Mottershead Report, which, over its 2,400+ pages, includes a brief summary of its conclusions, along with  the entire 2,495 or so postings made by the Fake Sam Sloan to the internet, specifically USENET's *rec.games.chess.politics* ("RGCP.").  USENET is a decentralized message-distribution system whereby all subscribers send each of their messages to all other subscribers via e-mail or through special "news" computers and software.  The Mottershead Report, its conclusions, and separate collections of all postings, plus only those where Plaintiff was impersonated, are attached on CD as Exhibits C-1 through C-3 and incorporated by reference (mostly to "Mottershead number" for the articles) as if stated verbatim.

    31.   Because it is decentralized, it is impossible to censor USENET, and it has become the only "true free speech" zone on the internet.  As such, it is a "perennial" thorn in the side of chess politicos, as they cannot control its discussions or flow of information.  The

primary alternatives to censorship are defamation, harassment, and cyberstalking, but because they are illegal, the most favored alternative is "negative astroturfing," or flooding the group with meaningless "noise" posts for the purpose of drowning out the free-speech discussions, and in this case, to promote the moderated forum of Defendant USCF as a superior alternative.

32.   As part of the astroturfing strategy, Defendant Sloan, who appeared to the public not to have switched sides, would engage in his normal combat with the Goichberg Mafia, but only to the extent that he would, at their direction, reveal damaging info about Defendant USCF which would facilitate its bankruptcy, thus serving a dual purpose.

33.   The Mottershead report explained, in painstaking detail, what the imposter did. Plaintiff will spare the reader the technical proof and refer it instead to the conclusions (printed out as Exhibit C-2; full text of all posts and "Fake Ray Gordon" posts also attached on CD digital media as Exhibits C and C-1, respectively):

a.   Starting in June 2005, posts have appeared on Usenet newsgroups under the aliases of "samsloan", "Ray Gordon", "Jackass Lafferty", "AndrewZito", and "judgementday@clerk.com", as well as others. The posts on rec.games.chess.politics alone number in the thousands, and were cross-posted on several other Usenet newsgroups, rec.games.chess.misc, other rec.games.chess newsgroups,alt.chess, and others. (Exhibit C-2, Mottershead Conclusions, p. 1).

b.   In addition to impersonating Sam Sloan and Ray Gordon (who are real participants in the newsgroups) as well as others, these posts, which will be referred to here collectively as the Fake Sam Sloan (FSS) posts, attacked and/or libelled the USCF, Sam Sloan, Ray Gordon, Brian Lafferty, Bill Goichberg, Erik Anderson, Beatriz Marinello, Hal Bogner, Paul Hoffman, Jennifer and Greg Shahade, and numerous other officials, sponsors, staff, and

members of the USCF in language that was frequently extremely profane, obscene, indecent, racist, and misogynist.

    c. My [Mottershead's] conclusion, based on the evidence available to me, is that one person was responsible for all of the Fake Sam Sloan identities and the posts under those identities on Usenet, and that this person was Paul Truong, now a member of the USCF Executive Board. Many of the posts were made after December 2006, when Paul Truong became a candidate in the election for the USCF Executive Board. Some of the targets of the posts were other candidates in the election. Some of the posts have been made since August, when Paul Truong and his wife, Susan Polgar, became members of the USCF Executive Board.

   34. Mr. Mottershead severely understated the nature of the imposter's conduct towards Plaintiff, which also included making terroristic threats in Plaintiff's name, sexually harassing female employees of Defendant USCF, and deliberately attempting to incite individuals who were either perceived as mentally unstable, already disliked Plaintiff or could be easily manipulated into doing so, or who had ties to organized crime.

   35. The Defendants (other than Sloan), despite posturing as neutral or even against the Mottershead report, and despite retaining an expert to refute its conclusions, has been unable to find even one computer expert who can proffer even a marginally plausible alternative to the conclusion that Defendants House of Truong was the imposter.  Consequently, apologists for Defendants House of Truong have embraced the equally unsupported theory that a "superhacker" managed to make the posts, unknown to Defendants House of Truong, for two years, at three separate locations, dovetailing every last technical fingerprint.

   36. Plaintiff avers, simply, and based on the Mottershead Report, that there is no doubt that the imposter was Defendants House of Truong, with the postings likely made by

Defendant Truong at the urging of Defendant Polgar.

37.   It should also be noted that the imposter's role was not minor, because of the incredible legal risks inherent.  No reasonable person would take these risks without an assurance that the target, known for being litigious, would not take action.  Normally, internet imposters post from anonymous, untraceable remailers, but because they are untraceable, these postings are never taken seriously.  By contrast, the imposter posted through Google Groups (at first via AOL, which no longer carries USENET), which meant that its identity could have been uncovered by a subpoena from any of its targets.

**The Fake Sam Sloan And First Fake Ray Gordon: July 2005-February 2006**

38.   Plaintiff was not impersonated by the imposter until March 17, 2006.  He was, however, impersonated briefly by an anonymous-remailer poster in early 2006, apparently in response to concerns he had raised over the hiring of Jennifer Shahade as the web editor for *Chess Life*.  This is notable because, in response to one of these impersonations, Defendant Channing referred to Plaintiff as a "nutcase."  At the time (late January or early February 2006), Plaintiff had assumed that Defendant Channing had simply believed the imposter to be Plaintiff.

39.   Plaintiff's concerns over the Shahade hiring were numerous: the position had been created for her, no one else was interviewed for it, including no men, and given USCF's rather public posture of always wanting to attract more women into the game, Plaintiff believed that this constituted prima facie gender discrimination in violation of Title VII and the PHRA, because to hold otherwise would be to make such discrimination a matter of not circulating positions, and simply hiring from within the preferred class, without anyone ever knowing the position was available.

40.   On February 22, 2006, Plaintiff, e-mailed Joel Channing with his concerns over

11

both the "nutcase" posting and the Shahade hiring. The subject of the e-mail was "I Feel Discriminated Against." The content of that e-mail (Exhibit B-1), is included in Defendant Channing's response, which follows:

> Dear Ray,
>
> I'd like to be able to have a serious dialogue with you. Please tell me more about yourself.
> Joel
>
> -----Original Message-----
> From: LeModernCaveman@aol.com
> [mailto:LeModernCaveman@aol.com]
> Sent: Wednesday, February 22, 2006 11:12 AM
> To: joel@channingcorporation.com
> Subject: I feel discriminated against
>
> Mr. Channing:
>
> I still have not seen a retraction for your "nutcase" remark on the web. Now I see USCF has hired someone for a job for which I might have been qualified, and didn't even bother to circulate the job.
>
> Your statements against me appeared designed to harm my employment prospects, and it appears that USCF violated its own policy about board members *or their families* profiting from USCF within two years of their tenure ending.
>
> It appears someone has told you that I don't have rights. Whoever that was, was misinformed.
>
> Ray Gordon

41.    At the time, Plaintiff had no reason to suspect that Defendant Channing was directly involved with the imposter, and in fact had contacted him due to his apparent (relative) neutrality on the Board. Plaintiff felt that, as a successful businessman rather than a lifetime chess politician, that Defendant Channing might better understand his concerns.

42.    Defendant Channing's e-mail, which did not include an apology for the mistaken identity, was followed up by another e-mail, also of February 22, 2006 (Exhibit B-2), which

stated:

> I'm disappointed that you can't (or won't) help me authenticate your claim of innocence. Of course, you understand that the author of that pornographic Shahade posting could never be considered for any position with USCF.

43.   In another exchange, of February 22-23, 2006, Plaintiff and Defendant Channing

exchanged one more argument (attached as Exhibit B-3), as follows:

> Channing:  You can't be serious!  The writer of that pornographic Shahade posting is an immature, angry person whom no responsible person would ever hire.  Sorry you don't take me seriously enough to help me to be convinced that you are telling me the truth
>
> Plaintiff: [In response] Your intransigence has inspired me to actually pursue this. Your refusal to retract your statements is reflective of a desire by you to leave the world with a memory of you calling me a nutcase.  I've decided that disability bigots don't belong on the USCF board and think you should resign.  Since you likely won't do that, a defamation lawsuit (which I'm strongly weighing) is the only way to clear my name short of a retraction.  It's sad that I would be forced to have to endure such a burden, but I'm dealing with someone who thinks defamation law doesn't apply to him.
>
> Please also be advised that I have contacted the Nashville office of the Equal Employment Opportunity Commission (EEOC) and requested that the forms necessary for filing a discrimination charge be sent to my home for completion.  It will take a few days for that to arrive.  When it does arrive, I intend to file a complaint on the grounds of disability discrimination (that "nutcase" remark doesn't exactly refute my claims), retaliation discrimination (specifically, USCF standing down while I get harassed or defamed, possibly by USCF board members in disguise in some cases, and USCF not hiring any known whistleblowers out of fear of other illegal activities being uncovered), and class-action gender discrimination, since no men were considered for the job offered to Jen Shahade. The reported salary of $75k a year also raises Equal Pay Act concerns.  The evidence strongly suggests that both the hiring and the salary were motivated by a desire of USCF's to appeal more to its female customer base, which is not a BFOQ.  I will note in my complaint that USCF disputed the salary figure, but also would not provide any numbers to refute it.  Since they are not under oath on newsgroups, there is no incentive for them to necessarily tell the truth.  Finally, there are issues related to a board member's family profiting from the board member being on board less than two years after his tenure was up.  There may be public interest concerns at work here.
>
> I trust USCF will do everything in its power and duty to protect me from further retaliation over this matter, including at tournaments or on the internet, given that I am fully intent on proceeding at this point.  The only way to stop an EEOC complaint from me at this point would be to reopen the search process to the public and disclose the salary and benefits structure.  You can be sure that any retaliation I encounter will be reported, and may give rise to a second complaint in which the

underlying situation here is not even relevant (since it'd be retaliation over a claim, not necessarily a winning one). Personal attacks against me would still not explain why no other men were hired, or why a woman is being paid so much for a job that apparently should pay far less. I regret having to take these steps, but I cannot imagine why someone would not simply retract an alleged "mistaken identity." <u>Even then, calling the mistaken identity a nutcase is still defamatory against me. That a questionable hiring process was going on at the time for a job category that is perfectly in line with my experience only makes the thing, as Parr said, "stink to high heaven."</u>

I have nothing more to say on this matter and write to notify you simply that I have now decided what to do. I have given USCF an opportunity to avoid this path, simply by giving equal opportunity to everyone, rather than acting like a gushing suitor over a young female they were so smitten with that they didn't bother to offer the job to anyone else, and who they rushed into hiring because they "didn't want to lose her."
Sincerely,
Gordon Roy Parker
a/k/a "Ray Gordon." (Emphasis added).

44.   The second and third contacts from Defendant Channing were disconcerting to Plaintiff, because he refused, without proof to the contrary, to take Plaintiff's word that he was being impersonated anonymously, although one which appeared more a product of a natural reaction to defend his hiring decision than any grand scheme to plunder Defendant USCF. Plaintiff was also concerned that any evidence he supplied concerning the imposter might be used by the imposter (Plaintiff had not completely ruled out Defendant Channing), and was also concerned that Channing was demanding that Plaintiff meet an impossible proof, since anonymous-remailer messages are untraceable. At the time, he chalked Defendant Channing's conduct up to misguided intransigence, and stopped corresponding, while preparing to file his EEOC complaint.

### The Fake Ray Gordon: March 17-April 27, 2006

45.   On March 17, 2006, the imposter began targeting Plaintiff on USENET, with a posting that "parroted" a previous poster threatening Defendant Sloan with jail for "spamming USENET." The imposter, as Plaintiff, posted "Can I play too?" (Mottershead #288411)

14

46.   Following are other notable statements made by the imposter, as Plaintiff, from postings which were archived in the Mottershead Report, from the time period of March 17-April 27, 2006, with footnotes or comments, where appropriate:

a.   "I think she [female Russian grandmaster Alexandra Kosteniuk, a "rival" of Defendant Polgar] cheated."

b.   "I've never seen it. Only saw the one with M.A." (Mottershead 288436). This post implicates former board member Michael "fpawn" Goodall, of California, as a possible co-conspirator, due to the signature which appears in the posting.  Due to no corroborating evidence, Goodall has not been named.

c.   "Do you want to fuck her?" [Batchimeg Tuvshintugs].  Ms. Tuvshintugs was fifteen years old at the time of the posting, which was made by the imposter in response to a post by Defendant Sloan.  (Mottershead #288438)

d.   "So you [Marcus Roberts] finally admit that you're taking blood money from Ilyumzhinov. We knew that all along." (Mottershead #288456).

e.   "Your resume is shit. You're nothing but a cocksucker. You blow Ilymzhinov for blood money.I live in PA. Wanna come and get me? I let you blow me.  My address is: 4247 Locust Street Philadelphia PA 19104.  Come and get me asshole [Marcus Roberts]." (Mottershead #288472-274, duplicates).

f.   Several postings threatening Marcus Roberts, perceived by Truong to be mentally unstable:

1) "Yes, he does. You're dead meat." (Mottershead #288479)[1];

2) "He does. You're [Marcus Roberts] dead potato." (Mottershead #288481);

---

[1] This is a terroristic threat made over federal wires by the imposter, as Plaintiff

3) "We love you Marcus Roberts. We really do. That's why we want to pay the proper tribute that you deserve. See you in May." (Mottershead #288681);

4) "Marcus Roberts will get what he deserves. He's gonna to get it good. Does he believe in God?" (Mottershead #288732);

5) "We should cut Marcus Roberts' balls and give it to Ilyumzhinov. I'm glad you'll get him in May. Good luck!" (Mottershead #288732).

6) "Time to cut off Marcus Roberts' dick and shove it down his throat." (Mottershead #289044).

7) "And you're an asshole. You're dickhead. You're worthless. You need to be eliminated." (Mottershead #290323).

g. The imposter then turned attention to inciting female rivals of Defendant Polgar, all as Plaintiff:

1) "She [Kosteniuk] wants the attention. Her husband wants to show off his 25 years younger jewel. It's about their ego. It's not about chess. It's about money in their pocket. Same goes with chess bitch [Jennifer Shahade]." (Mottershead #289849).

2) "I'm not jealous. I'm mad that [Kosteniuk] didn't blow me." (Mottershead #289870).

3) "We can bring back the sassy editor [former *Chess Life* editor Kavel Pehme, who caused controversy with "adult" themed articles] who will feature Kosteniuk in a thong and Shahade topless. That will sell chess for sure." (Mottershead #289873).

4) "I bet old Hassie [RGCP regular Richard Haas] likes Marinello and Shahade. They have huge ones." (Mottershead #291874).

h. "60,000 kiddie members don't know and don't care who GM Evans is. They

care about who Jennifer Shahade is. She's a chess bitch and a hottie. They ditched GM Evans for WGM Shahade. Who would you rather look at? Shahade or Evans?" (Mottershead #290273).

47.   The imposter would not target Plaintiff again after April 27, 2006, until May 20, 2006, the reasons for which were temporally conclusive.

48.   On April 27, 2006, in response to an e-mail restating his discrimination/retaliation concerns, Defendant Channing e-mailed the following to Plaintiff, with the April 27 message from Plaintiff in the full exhibit (B-4):

> Dear Ray,
>
> Thank you for writing me.  What bothered me about some of your postings was the cursing, the very personal negative comments, and the angry confrontational tone of them.  That approach is counterproductive.  I'm not at all offended that you might have a beef with anyone, including me.  I recommend you read the short story *The Devil and Daniel Webster* by Stephen Vincent Bennett.  It pretty well gives you my view on how to be effective in debate.  <u>I appreciate the serious and sincere tone of this email and I look forward to hearing from you again.</u> (Emphasis added)
>
> Joel Channing

49.   In a second e-mail of April 27, 2006 (Exhibit B-5), Defendant Channing explained what he claimed was the motivation for the Shahade hiring:

> As for Jennifer, she was our runner up candidate for *ChessLife* editor (we reviewed a lot of resumes and interviewed quite a few people), and part of the decision to hire her was, as I recall, a sort of spontaneous decision by the Board (excluding Greg, who wasn't part of any deliberations).  Part of what swayed me was the idea that her contacts might be useful in getting good articles and interviews from well know chess personalities.  Any, I had been favorably impressed by her and the idea of hiring her made sense to me.  My background is strictly private sector, and I am becoming more aware of the sensitivities involved with matters that I used to look upon as routine decision making.
>
> <u>Anyway, I'm not at all offended by the fact that you feel that you may have to pursue your grievance formally, rather I'm happy that you felt you could tell me about it in such a civil way.</u>
>
> Sincerely,
>
> Joel Channing

17

50. At the time, Plaintiff had no idea that the imposter would cease targeting him for the next month. Mr. Channing no doubt felt that he had provided a sufficient explanation for the Shahade hiring, to the point where he would not have to worry about discovery in a protracted discrimination suit foiling his other plans. With Plaintiff "at bay," at least temporarily, and with the 2006 elections coming up, the imposter turned its attention back to Defendant Sloan, the original and still primary "target," as well as the one that wouldn't fight back where or when it counted. Any lawsuit Plaintiff would file would likely be decided on the purely technical issue of whether or not failing to circulate a job opening is discriminatory.

51. Until May 20, 2006, the imposter took another "vacation," this time due to Defendant Channing pondering the issue of internet liability, and letting the EEOC clock for Plaintiff tick down.

52. On May 31, 2006, Defendant Channing posted a message to the USCF Forums urging the Board to approve of internet liability insurance for the USCF forum. That insurance would not be obtained immediately. Channing's failure to secure the insurance through the Board just prior to that led to the imposter resuming once again.

### Sloan Wins!  The Fake Ray Gordon: May 20-September 19, 2006

53. With the 2006 Board elections on the horizon, the imposter began using Plaintiff's name to "target" Defendant Sloan with an over-the-top smear campaign, for the purpose of creating enough sympathy for Defendant Sloan to win, while lending credence to the notion that Sloan was striking nerves within Defendant USCF, and would be useful at exposing wrongdoing if elected. To further keep up appearances, Defendants House of Truong and Goichberg/CCA took additional steps to disparage Defendant Sloan's candidacy.

54. The Goichberg Mafia's plan worked, as Defendant Sloan was elected to the

18

Board on July 21, 2006, giving Defendant Goichberg a stealth supporter and straw-man to bolster his control over Defendant USCF.

55.    During this phase of the impersonation, the imposter found Plaintiff an ideal "mule" for its messages, which were centered mostly around the upcoming election.  They included the following statements:

  a.    Some posts targeting Beatriz Marinello:

    1)    "Dykes [Beatriz Marinello] chew? I thought they suck?" (Mottershead #293925).

    2)    Why is [Marinello] such a bitch? Is it because she's not getting enough at home? (Mottershead #293933).

    3)    "It has been confirmed that Marinello has been added to Ilyumzhinov's team. She'll serve as the head whore for Azmaiparashvili."  (Mottershead #294552).

  b.    Shahade and Hoffman know the right people. That's a cool $90K for minimal work." (Mottershead #295010-12, posted in triplicate).

  c.    And now some posts targeting Defendant Sloan:

    1)    "Sloan is a mental case for sure. He likes to fuck dykes and minors." (Mottershead #295159).

    2)    "Does Sam Sloan realize that he's a big asshole? No one gives a shit about what he says. He's also a child molester and criminal." (Mottershead #295215).

    3)    "The USCF should censor everything written by you. You're a criminal, a child molester and an asshole." (Mottershead #295232).

    4)    "You're [Sloan] still an asshole and you should be banned in chess. Go fuck yourself. Zito got it right. You're a fucking child molester. It's time that everyone knows

about this." (Mottershead #295541).   (The post was signed "Bill Brock").

        5)   "He [Sloan] is a child molester and a criminal. He should be banned from chess and the USCF." (Mottershead #295556).  (Also signed as Bill Brock).

        d.   "Twoje oczy sa jak dwa ksiezyce. Bardzo mi sie podobasz. Kocham Cie. Wyjdziesz za mnie?" (Mottershead #295727).  Plaintiff has no idea what this means, didn't write it, and couldn't even tell the court in what language it is written.  Signed "Wlod.")

        e.   "You're a fucking lunatic. You [former board member Michael Goodall] and Sloan should be banned from chess." (Mottershead #296113).

        f.   "Don't kiss my ass. I'm never gonna vote for you. You're a child molester and a scumbag, You raped those minors and you should be in jail." (Mottershead #296189).

    56.  Plaintiff was minimally targeted during this period because he had the right, at any time, to file with the EEOC.  The postings were also not likely to trigger any EEOC claims, as they did not pertain directly to Plaintiff, nor defame him beyond the impersonation.

    57.  It is <u>extremely</u> notable that while, in the past, there was clear temporal proximity – a "temporal hand in the cookie jar" even – between an increased threat of exposure and the imposter backing off Plaintiff, often within days or hours of the trigger, yet when Defendant Sloan sent an e-mail to Defendant USCF's Board on  July 31, 2006, warning that "Paul Truong is the Fake Sam Sloan," the imposter continued targeting Plaintiff, which is totally inconsistent with its responses to other exposure "threats."

    58.  In response to his July 31, 2006 letter, Defendant Sloan notes, in paragraph 49 of in <u>Sloan v. Truong</u>, that "<u>[e]vidence establishes that [Defendants Goichberg and Channing] have known all along that Paul Truong was the Fake Sam Sloan</u>. (Emphasis added).  Defendant Sloan further notes in paragraph 52, that systems administrator Mike Nolan "could have…checked the

IP addresses of [the House of Truong] and compare[d] that with the IP address of the Fake Sam Sloan and the Fake Ray Gordon.  <u>Not only did Bill Goichberg and Joel Channing fail to tell Mike Nolan to do this, but  rather they told him not to do it.  They also severely and publicly censured him for this.</u>" (Emphasis added).

59.   What Defendant Sloan fails to note is that he knew this not from any sleuthing, but because he was in on it, and his "expose" was part of the larger insurance scam being perpetrated on Defendant USCF.  <u>The entire purpose of this charade was to manufacture sufficient liability</u> to settle the resulting lawsuits for large sums of money, but insufficient liability to trigger further consequences for the conspirators, while ensuring plausible deniability. What was more clear than ever at this point was that the "perennially" inept Defendant Sloan had seemingly, and very suddenly, acquired "whistleblower superpowers."

60.   When one considers the options available to Sloan on July 31, 2006, his omissions loom too large: despite having argued, without counsel, before the United States Supreme Court (and winning 9-0 on one technical issue), and despite his having filed several *pro se* lawsuits, demonstrating his procedural competence, he lifted not one finger towards any substantive legal action that would have led to discovery of the IP addresses which he sought. The threat of actual exposure was unchanged, and the outcome of this faux-combat was simply to reinforce the idea that Defendants House of Truong were targeting Defendant Sloan, with the approval and knowledge of Defendants Channing and Goichberg, and with Defendant Sloan attempting to stop it.  In reality, all were acting together as convincingly as possible, as further evidenced by the public nature of the "retaliation" against Defendant Sloan.

61.   The charade was carried even further when, around that same time, Defendant Goichberg contacted  Defendant USCF's attorney, Michael Matsler, at a cost to Defendant

21

USCF of $4,788.00, to determine if Defendant Sloan could legally be removed from the Board, or if the election results could be invalidated. This too was for show, as such behavior targeting anyone but a co-conspirator would have been far too risky, especially for a fellow Board member. The paper trail was convincing, yet not a catalyst for anything, except convincing the public further that something was seriously wrong with Defendant USCF.

62.   Finally, paragraphs 54-60 of <u>Sloan v. Truong et al.</u> refer to "picturegate," yet another public "dispute" between Defendants Sloan, Channing and Goichberg about Defendant Sloan's use of an old picture of he and Defendant Polgar on his website. A melee on the USCF Forum ensued, with Defendant Sloan's "enemies" (including the usual-suspect co-Defendants) all demanding that the picture be removed. As this was hardly a legitimate issue for Defendant USCF, it was a total waste of that Defendant's resources, for the purpose of continuing a "conflict" so fake it would make Vince McMahon blush, solely for public "benefit."

63.   What is notable about the "picturegate" affair is that it reminds us that Defendants Sloan and Polgar have known each other quite well for over two decades.

64.   Count III of <u>Sloan v. Truong</u> seeks relief primarily, not from any co-Defendant listed here (surprise!), but rather from outsider William "Bill" Brock, a baited participant in the flame-war with a penchant for crossing defamation lines, including against Plaintiff over the years. This disposition made him a perfect target for the Goichberg Mafia as well, as it was able to bait him into crossing the line and being sued by Defendant Sloan, thus increasing any potential settlement, as the postings cited are in fact defamatory. While the other co-Defendants may be listed, a prearranged settlement is a perpetual convincer and escape hatch.

65.   The imposter would not target Plaintiff again until October 6, 2006, again in direct temporal proximity to another trigger, this time a complaint by Plaintiff to Defendant

Channing not about the imposter, but about Matthew Nemmers, at the time the head of

Defendant USCF's Military Chess Committee:

### The EEOC And The Fake Ray Gordon: October 6, 2006-February 16, 2007

66.   On October 3, 2006, Plaintiff complained by the following e-mail to Defendant

Channing (Exhibit B-6) about an increasingly hostile and threatening smear-campaign directed

against him by Mr. Nemmers:

> Subject: Libel From a USCF Committee Head
> Date: 10/3/2006 4:05:30 A.M. Eastern Standard Time From: LeModernCaveman
>
> Subject: Libel From a USCF Committee Head
> Date: 10/3/2006 4:05:30 A.M. Eastern Standard Time
> From: LeModernCaveman
> Reply To:
> To: joel@channingcorporation.com
> CC: LeModernCaveman
>
> Dear Mr. Channing:
>
> You said previously that USCF had no control over the conduct of its membership
> when I pointed out this posting [by Nemmers] to you.   Mr. Nemmers has now
> posted that he is the "new chairman of the USCF military committee."
>
> Either you knew this when I sent you my letter, or you decided to approve of his
> becoming chairman knowing that he had publicly claimed that I was unemployed.
>
> Since USCF appears to believe itself immune to legal action over such conduct, I'll
> spare the normal cease-and-desist verbage, as it seems nothing short of a lawsuit
> will result in anyone there respecting my rights.
>
> Ray Gordon

67.   Also on October 3, 2006, Plaintiff contacted Defendant Channing once again

concerning Mr. Nemmers's USENET posts, which imputed unemployability upon Plaintiff, and

which claimed that "no one [at USCF]" took his complaints seriously.   In the e-mail (Exhibit B-

7), Plaintiff merely asked that Defendant Channing investigate, since Mr. Nemmers was an

ambassador for USCF, and its military representative.   As an active-duty marine, he also posed a

potential physical threat to Plaintiff, who began fearing for his physical safety.

23

68.   In response to the October 3, 2006 mails, on October 6, 2006, Defendant Channing e-mailed Plaintiff (Exhibit B-8) the following:

> Ray, I was preparing to research your claim when I saw your latest disgusting posting regarding Susan Polgar. I gave you the benefit of the doubt once but you just don't seem to understand anything. I give up. Don't ever bother to contact me again. I've got serious work to do on behalf of civilized people that love chess. Joel Channing  (Emphasis added)

69.   By this point, Plaintiff was reasonably certain that the imposter was Defendants House of Truong. However, it was not at all clear that there was any connection to the other Defendants, especially Defendant USCF, since Defendants House of Truong had not been elected to the board, and because Defendant Polgar's business relationship with them seemed natural given her status as a grandmaster and top female player. The "smoking gun" of the Mottershead report was still a year (to the day!) into the abyss.

70.   Shortly after the October 6, 2006 e-mail from Defendant Channing, Plaintiff went to EEOC, on or around October 12, 2006. He was given an early November 2006 appointment, kept it, and a charge was then filed. He was issued a right-to-sue letter on either May 29 or June 14, 2007 (Plaintiff initially believed the latter), which gave him (he thought) until September 12, 2007 to file suit.

71.   True to form, the imposter resumed targeting Plaintiff on October 6, 2006, and would continue uninterrupted through February 16, 2007:

a.   [SUBJECT: "Young Chess CUNT For Hire?"] "Which young chess cunt will shag me for $25? Liz Vicary, Jenny Shahade or Laurie Ross?"  (Mottershead #30269).

b.   "You know I can sue you [Nemmers] for libel. You're asking for it."[2]

---

[2]  This was made in response to one of Nemmers' postings, which included the following statements by Nemmers: "Do your own homework, smarty-pants. Why you should care about an. organization you have no vested interest in (as a NON-MEMBER) I have no idea. But go ahead....stomp around in your little pink booties and whine and cry about how the USCF mistreats you and question every decision they make, even though you don't have standing to register such complaints (as a NON-MEMBER) and even though nobody's listening to your pathetic sour grapes pissing and moaning anyway.

(Mottershead #302271).

      c.    "Stop impersonating me! Stop it now!" (Mottershead #302272).  This post was in response to a post by Plaintiff which explained that the post in b) above was not posted by Plaintiff.

      d.    "But do you [Jennifer Shahade] love your cunt and tits? I bet you do. They're yummy." (Mottershead, #303527).

      e.    [SUBJECT: "I'm suing Jennifer Shahade."]  "I'm suing Jennifer Shahade for taking a job that clearly belongs to me. Everyone knows I'm the most qualified person for the web editor job." (Mottershead, #303538).

      f,    "My Mom has given me a 30-day notice to move out of her house. I'm outraged! Where am I supposed to go now? I have no job and I have no money. I'm banking on cashing against the USCF. Now my plan is all fucked up." (Mottershead #303976).[3]

      g.    "How about $15 [an hour, for sex with Sam Sloan's wife]?" (Mottershead, #304170).

      h.    "The [*Gambit: The NY Times Blog*] job went to Dylan McClain. I applied for the job but didn't get it. I'll sue the NY Times for discrimination." (Mottershead, #304673).

---

All you're good for is a few childish, pathetic, (and let's not forget to mention LAME) one-liner flames against upstanding people like GM Susan Polgar a few times every month.  That's all.  The only thing you've ever contributed to the game you claim to "have such talent for" is a couple of feeble insults against the top players, organizers and v

That's it!  How does that FEEL, Gordo?  And how does it feel to know  that you and all your whining, crying and threats of litigation don't even REGISTER on their emotional or psychological radar?

You're such a small, weak, pathetic little man.  If it wasn't for your personality and unjustifiably tremendous ego, I'd almost feel sorry for you and offer you some change for your cup.  But I don't and neither does anybody else.  Now go make me a sandwich.
[3] As anyone with access to PACER could have verified since the day after it occurred, Plaintiff's mother, Penny Parker, died of stomach cancer on July 26, 2007 at 4:58 a.m.  As her will was never probated because her estate was insolvent, Plaintiff will aver only that the tooth fairy, and certainly not his mother, nor her estate has not been paying his rent at the same address since, and that Plaintiff now earns enough to support himself above the poverty line. Note the paid-for filing fee.  For the past several years, Plaintiff's income has been artificially deflated due to his providing substantial, end-of-life care for his mother.

Also at issue in this case is a recent posting to that blog approved by McClain.

    i.    "Evans is senile and can't write anymore. Parr ghost writes for him for 50% fees. That's why Parr is pissed because he lost a monthly paycheck for ranting about Fischer. What a fucking pig. Byrne resigned and so should Evans. Bring on young cunts like Irina, Beatriz or Jennifer." (Mottershead, #304674).

    j.    "It has been confirmed by Goichberg, Channing and Schultz that Sloan raped young boys." (Mottershead, #304717).

    k.    "I'll run [for USCF Board] if someone pays my USCF membership and $250 filing fees." (Mottershead, #304718).   This post was made in response to a posting by Nemmers that claimed Plaintiff, among other things, was "typing badly at fictitious law firms."

    l.    "Jennifer Shahade aka the Chess Bitch got her job as a payoff from Don Schultz to her brother Greg Shahade. How many other people were interviewed for the position of web editor? Was the position ever announced? Was it ever advertised? I'm positive it didn't. It's clear that this was an illegal political move by Don Schultz, Joel Channing. and Bill Goichberg." (Mottershead, #306146).  (Signed and posted as "Sam Sloan").

    m.    "Didn't you [Sloan] say you want to stick your manhood inside Marinello's private part? Which is your favorite? Mouth, pussy or asshole? As a candidate for the election, you need to address these important issues." (Mottershead, #306495).

    n.    "Did she [Jennifer Shahade] have sex with Beatriz Marinello?  You claimed you wanted to fuck Jennifer Shahade, Laura Ross and Chimi Batchimeg. Did you succed? The USCF members have the right to know." (Mottershead, #306496).

    o.    "Are you telling me you wouldn't fuck her [Jennifer Shahade] if you have a chance? Get real!." (Mottershead #306502).

p.   "Shit! He's gay? Hey Marcus, don't come near me or I'll cut your balls off." (Mottershead #306508).

q.   [SUBJECT: "Fake Sloan is the Real Sloan] "I've concluded that the Fake Sloan is indeed the Real Sloan trying to get attention for re-election. He's trying to make people feel sorry for him so he can get re-elected. He's totally busted!" (Mottershead, #307153)

r.   "Sloan is trying very hard to convince people that he's not the fake Sloan. But everyone knows that he's the same person starving for attention. He had his girlfriend posted things from NY on his behalf." (Mottershead, #307157).

s.   [SUBJECT: "Sam Sloan faked his own identity"] Sam Sloan lives for attention. He faked his own identity to get sympathy and attention from everyone. This is also a trick to leak information from Don Schultz. That's why Schultz refused to attack and ban Sloan. They deserve each other. Everyone knows their tricks." (Mottershead, #307169; see also #307188-90; #307202; and #307379 for similar claims from imposter that Sloan "impersonated" himself).

72.   The imposter would not target Plaintiff again until March 30, 2007. At this point, Matthew Nemmers had stopped posting towards Plaintiff altogether after a posting that discussed "shooting troublemakers" could have been construed as a threat of exposure. Plaintiff's general litigation history emphasizes ongoing threats, so backing off was their best chance to neutralize that. Plus, EEOC was inquiring about conciliation at that time.

73.   At this point, it becomes clear that the internet liability insurance policy – the third-party payoff for all for this entire charade – that had been acquired by the USCF, at the urging of Defendant Channing, was hardly innocuous. The motion to purchase the insurance was 07-007, suggesting it was passed in early 2007 and that the insurance was purchased then,

long after Defendants Channing, Goichberg, Sloan, and House of Truong were well aware of their role in creating the very internet lawsuit, <u>Sloan v. Truong</u>, whose attorneys and any results would potentially be funded by this fraudulently obtained policy, if not their existing policies, or that it would fund other litigation stemming from those facts.

74.     The theme of this impersonation arc was much more targeted towards Plaintiff, who was posing an increasing Title VII threat, and included several attempts to incite third parties against him, including Nemmers (military), Marcus Roberts (also impersonated and perceived as violent and unstable), and Jennifer Shahade (to anger her many male fans).

### The Fake Ray Gordon And The 2007 Elections: March 30-July 16, 2007

75.     With the 2007 Board election on the horizon, the imposter began targeting Plaintiff once again.  EEOC had shown little interest in taking over Plaintiff's case, and his threat to the Goichberg Mafia was perceived to be in check.  He was once again fair game.  Following is a summary of the relevant postings during this period:

a.     [SUBJECT: "Tips on how to seduce women"] "Win the lottery!" (Mottershead, #309083; <u>see</u> <u>also</u> #309088, #309090, and #309095)

b.     "[Brian] Lafferty is a crooked lawyer. Is it true? Is it true that he overbilled his clients? Maybe we should do something about it?" (Mottershead #309112).

c.     "It really sounds good so far. Go for it. You may want to point the finger at Bill Goichberg and Joel Channing for stopping you do your job. If you blame Goichberg and Channing, you can win. Don't forget to praise Don Schultz. You and Schultz make a good team." (Mottershead, #309176; <u>see</u> <u>also</u> #309182).

d.     "You're a strong candidate and you should be USCF President. I support you for the board. But lying and attacking other people make you weak. Why do waste your time attacking Polgar or Berry? She'll win no matter what and he has tons of money. You need to

attack people like Bauer and Lux. That's your ticket to win the election. Do you want to win or lose? Wake up my boy." (Mottershead, #309261; see also #309268).

    e.    "Is this the same Brian Lafferty who was caught stealing money from his clients in the east coast?" (Mottershead, #309353)

    f.    "I agree. The slate of Sloan, Jones, Goodall and Schultz is the best. I would vote for them too." (Mottershead, #309391; see also #309444, #309892, #309959, #310050, and #310078).

    g.    "Yeah, and I'm the best seduction method on the planet!" (Mottershead, #309445).

    h.    [SUBJECT: "I hereby suspend Polgar from the USCF"] "I don't want her to win the election. She'll probably ban my friend Sam Sloan. A woman has no business being in charge. Vote for Sam Sloan, Don Schultz, Stephen Jones and Mike Goodall to keep things the way are. We don't need any stinking change." (Mottershead, #309557; see also #307559, #309614, and #309691).

    i.    "Is this guy [Lafferty] for real? Is he the biggest asshole ever? I heard that he screwed old ladies out of money before. Is it true?" (Mottershead #309619; see also #309810).

    j.    "Donna Alarie used to be the scholastic coordinator for the USCF before Diane Reese. She lasted on this job for 1 month before she was fired. That's why she hates everyone and is out to sink this federation. What a bitch! Her gay boyfriend Brian Lafferty is helping her do this. They're Leroy Dubeck's puppets to destroy Bill Goichberg." (Mottershead, #309624).

    k.    [SUBJECT: "Vote against Goichberg."] "I would definitely vote against

anyone that Goichberg recommends." (Mottershead, #309756).

l.    "Everyone should vote against anyone Bill Goichberg recommends. Goichberg recommends Don Schultz who is known to leak info to Sam Sloan. He recommends Stephen Jones who is endorsed by Brian Lafferty, a lawyer who wants to sue the USCF and its members. He recommends Joe Lux who is against scholastic training and who has no management or business experience. Goichberg is one of the reasons why Sam Sloan is elected. Goichberg has no comprehension of the word conflict of interest running CCA and the USCF." (Mottershead, #309758).

m.    [SUBJECT: "Candidates who molest children"] "There are at least 2 candidates in the uscf election who are known to have inappropriate sexual contacts with minors. Who are they?" (Mottershead, #309875; see also #309898, #309901, #309902, #309905, #309909, #310044).

n.    "Put hot chicks with big tits like Shahade and Marinello on TV. They take off their shirts and the ratings till zoom." (Mottershead, #309920).

o.    "Gregory Alexander said "I assure you, from this moment forward; I will never do business with you. Don't call me, don't write personal letters to me again Hal. Our friendship is terminated."   Smith said: "I wouldn't recommend anyone do business with him. If this is how he handles confidential information, just imagine what Chess Magnet School might do with your personal information."   These people said never to do business with chessmagnetschool.com.   They don't trust Hal Bogner. Why not? Is he as bad as they said?" (Mottershead, #309924).

p.    "I see you are making fun of [Defendants] Paul [Truong] and Susan [Polgar].   These are two people who have done much to raise chess above a hobby level.   Their

impact with the school system and scholastic chess, and having such a high profile of main-stream media coverage and articles published; has been perhaps the most successful coverage of chess in the media, since the Fischer era.  And all of the Fischer stuff was not positive.  I have found both parties credibility way above average.   Is this the same Jerry Hanken who supports the Treasurer of the Chess Journalists of America to keep secret from other CJA Board members, all financial records?   As well as to only keep a secret record of CJA Board motions passed, with no record made available to its members?   And it appears that you have been caught is a number of published lies by you in your own CJA magazine published online.  Would you like to have the particular pages & paragraphs cited?   Hanken, you also have done a good amount for chess.  If you would only learn to not handle your chess responsibilities like a dictator." (Mottershead, #310069). (Signed: "J.W.").

q.    [SUBJECT: "Ray Gordon is a moron"]  "Hey moron [Plaintiff], Fischer was in the Philippines in 1997. He was in Hungary in 1992-1994. Did you even bother to check his website before your opened your mouth? Does your dick get hard when you dream about blowing your boyfriend?" (Mottershead, #310507).  This post was in response to Plaintiff noting that Defendant Polgar and her family housed American fugitive Robert J. "Bobby" Fischer in 1997.

r.    [SUBJECT: "Brian Lafferty caught having sex with a minor"] "Brian Lafferty, a well known attorney, was caught having sex with an 11 year old donkey. More news to come on www.samsloan.com."

s.    [SUBJECT: "Brian P Lafferty is a lying scumbag"] "Many people said that Lafferty is one of the most dishonest people on the USCF forums. They said he's done nothing for chess except making legal threats and insult people." (Mottershead, #311775).

31

76.   The election-season postings, expectedly, focused on the Board elections rather than Plaintiff.  Not surprisingly, they ceased after the elections, the results of which were all but moot at this point, as the destruction of Defendant USCF was well on the way.  All that was left at this point for the Goichberg Mafia was to let nature take its course, let the evidence surface, and to let Defendant Sloan run loose with his lawsuit, with the clear endgame goal of an insurance payoff to mitigate the lawsuit threats to the Goichberg Mafia members, and leaving a scandal sufficient to destroy Defendant USCF so that it could be plundered, while praying that Plaintiff would not file his discrimination lawsuit.  Had the imposter ceased here, the conspiracy would have succeeded, but it did not.

### The Fake Ray Gordon: September 8-26, 2007

77.   On or around September 8, 2007, Plaintiff had made it clear on USENET that he did not intend to file his Title VII case against USCF.  He had offered a no-cost settlement by e-mail a week earlier asking for some policy changes and more transparency in hiring, but that was ignored.  Even in his posting, however, he noted that the state-law time period had not expired, as PHRC's time limits are much more liberal, and Plaintiff further noted that he might change course if events warranted.  Events now warrant this.

78.   This time, the triggering event was the expiration of Plaintiff's Right-To-Sue letter, which caused the imposter to resume attacking Plaintiff, with more empowerment than ever due to Plaintiff's continued inaction.  As Plaintiff had not yet linked the imposter to Defendant USCF, he considered his two cases to be "weaker than the division of the parts" of the whole.

79.   Following are the remaining relevant imposter statements concerning Plaintiff during this time period:

a.   [SUBJECT: "Brian Lafferty, Sam Sloan and Marcus Roberts in a threesome"] No. You're a part stupid, and part gay. Have Brian Lafferty shove his dick in your

32

face and Sloan's dick up your ass. You'll enjoy it." (Mottershead, #313656).

      b.   ["SUBJECT: Brian Lafferty, Sam Sloan and Marcus Roberts in a threesome"] "No. You're a part stupid, and part gay. Have Brian Lafferty shove his dick in your face and Sloan's dick up your ass. You'll enjoy it." (Mottershead, #313656).

      c.   "I agree with her. Asshole like you [Sloan] should have been banned and thrown in jail long ago you sick pervert child molester." (Mottershead, #313687).

      d.   "That's right. I'm [the imposter is] also Randy Bauer, Joel Channing, Rodney Vaughn, Terry Vibbert, Marcus Roberts, Bill Brock and everyone else who thinks you're a despicable child molester. Keep guessing you little cunt." (Mottershead, #313697).  This post was in response to an accusation by Defendant Sloan that Defendant Truong was the imposter and author of a previous post attributed to Plaintiff.

      e.   [SUBJECT: "Actions against Sam Sloan for molesting children"] "Who gives a shit about your forum? Nobody posts there anyway. Perhaps they can put you in jail for molesting young girls." (Mottershead, #313719).

      f.   "Just look for Sam Sloan's name in the sex offenders registry." (Mottershead, #313920).

    80.   On September 14, 2007, the imposter posted a message to USENET/RCGP, in which he stated the following concerning Plaintiff:

> He doesn't want people to know that you're a child molester, a pervert, an asshole, a bum and a total LOSER. I live with my mother but at least I don't fuck kids like you.

    81.   Plaintiff's mother died on July 26, 2007.  He therefore has not been living with her since that time.  Prior to that time, he was her primary caregiver.

    82.   At the time of publication, Defendant Truong, along with any co-conspirators, either knew or should have known that Plaintiff's mother was dead and that the implication that

he was not working or supporting himself was completely without merit. A simple review of PACER would have located the filing in which Plaintiff sought an extension of time in <u>Parker v. Trustees of the University of Pennsylvania</u>, E.D.Pa. #05-cv-4874, due to her death, on July 27, 2007. This <u>provable fact</u> has been <u>a matter of public record</u> ever since.

83. On September 19, 2007, the imposter posted the following statements concerning Plaintiff:

> ["SUBJECT: Sam Sloan soliciting 8 year old girls"]. "This is a great idea. I wish I had thought of it. I wish somebody had thought of it. However, I am a bit nervous about posting in the Internet the names and ratings of very young children. I don't want to get caught. For example, should we post a list of the 100 top rated girls under 8 ? I think we should seek some advice on this touchy question before going forward. Can I solicit these girls? If I can then I'm all for it." (Mottershead, #314098; <u>see also</u> #314101, and #314110).

84. At the time of the above posting, Defendants House of Truong either knew or should have known that it was false and portrays Plaintiff in a completely false light, as he has not now, nor has he ever, had any sexual interest in eight year-old girls, nor has he ever accused Defendant Sloan of same.

85. As the Mottershead Report indicates, the September 19, 2007 posting was also significant because it was made via the ISP Suddenlink, a broadband provider in Texas, the rough equivalent of an electronic fingerprint for discovery purposes. The NNTP-Posting-Host was 75.111.194.9, as opposed to the 205.188.116.67 and similar "umbrella" IPs used by thousands of AOL users. Broadband companies like SuddenLink assign "static" and unique IP addresses to individual users that are easily traced.

86. On September 25-26, 2007, the imposter posted, to USENET/RGCP, as Plaintiff, the following statements:

a. [Subject: Did Hal Bogner and Brian Mottorshead hacked USCF members' accounts?] Is it possible for these 2 crooks to hack into the USCF computers? Does this mean

that Hal Bogner will do the same with customers of ChessMagnetSchool.com? Can they steal members' credit card information and rob them? Does anyone know the answer? (Mottershead, #314435; see also #314436).  (Posted as Plaintiff, what is known as a "setup question")

b.    "There is a pattern of confidentiality breeches within the USCF.... Unfortunately, there are individuals within the USCF that do not like criticism, and once a whistle blower has made an internal complaint, lawsuits are threatened after the complaint." (Mottershead, #314456).  (Posted as Plaintiff in response).  (Emphasis added).

87.    Both of the above postings were not authored by Plaintiff, and represent wanton, willful, reckless, targeted, pointed, and intentional conduct on the part of the imposter, with the specific aim of harming Plaintiff's reputation and inciting others to retaliate against Plaintiff. They also came from IP address 201.134.236.150, a Mexican IP.

## Aftermath of the Mottershead Report

88.    The publication of the Mottershead Report has shaken the chess world to its core. The general public has turned against Defendants House of Truong, believing them to be the primary, and often sole, wrongdoers.

89.    Since the Mottershead Report was published, Defendants Goichberg and Channing have kept up appearances by a) retaliating against Mottershead, suspending him from his duties, and disparaging his supposed violation of an NDA with Defendant USFC, even mentioning potential legal consequences at times, either directly or via their underlings.

90.    Defendants House of Truong have denied being the imposter, but have also presented the alternate theory that a hacker used a "Trojan" virus to post through their computer without their knowledge.  To the extent that such a "Trojan" exists or did exist, Plaintiff avers that the House of Truong was well aware of that as well, and that it would serve only to escape

liability.  Plaintiff further avers, however, that no such Trojan exists.

91.  Defendant USCF, via Defendants Channing and Goichberg, have fought <u>Sloan v. Truong</u>, with all attorney representation related to the case paid for by its liability insurer, believed to be Chubb, on the liability policy purchased long after the imposter began targeting Plaintiff.

92.  At present, everything is now in place for the Defendants to achieve their desired outcome: Defendant USCF is in shambles, with the Goichberg Mafia ensuring its future demise, while Defendant Sloan is set to receive a settlement payoff and/or a new power base in the eventual replacement federation, as the legal liability vaporizes into the settlement abyss and statements by all involved to "put the past behind us."

93.  This court should note that whether or not this is an insurance scam is almost completely irrelevant to Plaintiff, who would have identical standing to sue even if it were not. The same temporal-proximity arguments suggest a consciousness-of-guilt which supports the conspiracy between Truong and Channing, and it also supports the insurance fraud claim based on the timing of the events in this lawsuit, including the imposter's conduct, the highly-targeted nature of the liability insurance, and when it was sought and purchased, all prove, by preponderance of the evidence, that the Goichberg Mafia's intent was to defraud Chubb.

94.  It should finally be noted that had <u>Parker v. Google</u> been ruled in favor of Plaintiff by the United States Supreme Court, he could have recovered damages from Google, but that did not occur.  A nasty "circuit split" over Section 230 distributor immunity remains (all circuits but the Seventh embrace it, while that circuit explicitly rejects it), one which Plaintiff elects not to challenge at this time.

## COUNT I: DEFAMATION/INJURIOUS FALSEHOOD AGAINST ALL DEFENDANTS

95.   Plaintiff incorporates by reference, verbatim, the contents of paragraphs 1-94.

96.   Plaintiff avers, based on information and belief, that Defendants House of Truong, and particularly Defendant Truong, were, collectively, the imposter, or "Fake Sam Sloan/Fake Ray Gordon."

97.   Plaintiff avers that all of the 495 or so impersonations of Plaintiff attributable to the House of Truong constitute an injurious falsehood (that Plaintiff was the author of the postings), and that each posting portrayed him in a false light.

98.   Plaintiff avers that, almost without exception, each imputation made about Plaintiff in the course of the impersonations set forth in this complaint, was false, including a) the statement and inference that Plaintiff lives with or off of his late mother (paragraph 81), b) the statement that, on the date of the posting, Plaintiff posted that he solicits eight year-old girls for sex (paragraph 83); c) the imputation, by impersonation, that Plaintiff sexually harassed or stated anything attributed to him in those postings about Jennifer Shahade, Beatriz Marinello, Alexandra Kosteniuk; d) the statement and imputation that Plaintiff incited or otherwise threatened Defendant Sloan, Mr. Roberts, Mr. Nemmers, Mr. Bogner, and Dylan Mcclain; e) that Plaintiff is unemployed or unemployable; and f) lives with his late mother.

99.   Plaintiff avers that, during all relevant times, Defendants Channing, Goichberg and Sloan knew about the imposter, approved its conduct, at times specified the content of the postings, including the ones in this count, and acted in full conspiracy with each other.

100. Plaintiff avers that the statements a) were not privileged; b) were published, distributed to, and read by third parties, including by e-mail to Google Groups subscribers to RGCP; c) were not privileged in any way; d) were made with intent to harm Plaintiff; e) were

made with knowledge of falsehood, or alternatively, reckless disregard for the truth; and f) resulted in special economic harm to Plaintiff, directly attributable to defendants, in the form of lost chess-related income, lost seduction-related income (by portraying him as harassing the above women)., and other pecuniary harm.  Plaintiff further avers that the purpose of the sexual harassment against Shahade and Marinello was designed to create sexual-harassment liability against USCF in order to bankrupt USCF while getting them a settlement.

101.  Plaintiff avers that the injury itself, or alternatively, the true nature and extent of the injury, was not known to him until publication of the Mottershead Report, and that Defendants, including but not limited to Defendant Channing, used fraud and concealment to mask them.

102.  Plaintiff further avers good cause for not pursuing his own action, in that he would have done so had his resources not been severely restricted, and he could have hired an attorney to do so.  When the EEOC refused to take over his case, it also determined that no sexual harassment had occurred, based on the same evidence available to Plaintiff at that time.

103.  Plaintiff avers that each imposter posting constitutes a wholly separate act of libel/defamation, for which all Defendants are liable as principals or conspirators.

104.  As a direct and proximate result of the defamation cited in this count, Plaintiff has suffered substantial and irreparable loss of reputation, loss of past, present and future income, loss of enjoyment of life, loss of accumulated wealth, loss of employment.  For this, he is entitled to relief under the common law torts of libel (for the lies), trade libel (Plaintiff is a chess publisher and teacher, as well as rated player, and seduction-advice publisher), and false-light invasion of privacy, and states these claims for relief on that basis.

105.  Plaintiff is entitled to unspecified compensatory damages, punitive damages,

costs of suit, and attorney fees, in an amount to be determined at trial.

106. Plaintiff is entitled to injunctive relief sufficient to terminate the actionable conduct, and such other relief as deemed necessary by this court to make him whole.

## COUNT II: TORTIOUS INTERFERENCE AGAINST ALL DEFENDANTS

107. Plaintiff incorporates by reference, verbatim, the contents of Paragraphs 1-106.

108. Throughout all relevant times, all Defendants were aware of Plaintiff's economic interests in chess, including a) his teaching; b) his internet publishing; and c) his desire to work for Defendant USCF.

109. Plaintiff avers, based on information and belief, that all Defendants acted intentionally to cause third parties to break contracts with, or avoid contracting with, Plaintiff, not only in relation to his chess contracts, but also his seduction publishing work, specifically because the imposter parroted both Plaintiff's "name signature" ("Ray Gordon, creator of the pivot") and his posting signature (promoting his seduction websites), such as with his "win the lottery to get women" advice and similar statements set forth in paragraph 75 of this complaint.

110. The facts as set forth throughout the complaint and in Count I entitle Plaintiff to relief under the common-law tort of tortious interference, and he states his claim for relief on that basis.

111. Plaintiff is entitled to unspecified compensatory damages, punitive damages, costs of suit, and attorney fees, in an amount to be determined at trial.

112. Plaintiff is entitled to injunctive relief sufficient to terminate the actionable conduct, and such other relief as deemed necessary by this court to make him whole.

## COUNTS III-IV: FRAUDULENT/NEGLIGENT MISREPRESENTATION (ALL)

113. Plaintiff incorporates by reference, verbatim, the contents of paragraphs 1-112.

114. Plaintiff avers, on information and belief, that all representations made to him by e-mail from Joel Channing, from February 22, 2006 through October 6, 2006, were materially false, factually inaccurate, concealed vital information, and were made with the intent to deceive Plaintiff, and were made while Defendant Channing withheld knowledge that would have caused Plaintiff not to be deceived or misled.

115. Plaintiff avers that the misrepresentations by Defendant Channing were specifically designed to use falsehoods and false pretext to mollify Plaintiff's employment concerns. Specifically, Defendant Channing's claim not to know of the imposter's identity or conduct was fraudulent because, at the time, he not only knew or should have known that Defendants House of Truong were impersonating Plaintiff, but directed the conduct himself! His claim that USCF would not hire the author of "those [imposter] postings" was fraudulent because the actual author of those postings was not only hired by Defendant USCF, but in part for that explicit purpose, and with the full knowledge and approval of Defendant Channing.

116. Plaintiff avers, on information and belief, that Defendant Channing was acting with the full knowledge and approval of all co-Defendants, to further the interests of the Goichberg Mafia.

117. Plaintiff avers that, as any reasonable person would have done in that situation, he relied on the statements by Defendant Channing to form the beliefs that a) neither Defendant USCF, nor its board, held common-law malice against Plaintiff; b) the imposter was not conspiring with or otherwise acting with or on behalf of Defendant Channing; c) that Defendant Channing had no knowledge who the imposter was and for what purpose they were posting, d) that Defendant USCF or its officers were not retaliating against Plaintiff, and e) that they were tolerant of whistleblowing (See paragraphs 45-49).

118. As a direct and proximate result of Plaintiff's natural and logical reliance on Defendant Channing's statements were the primary reason he did not file his Title VII suit, and did not seek legal action against the imposter, as naming the imposter would have made an otherwise blind search more efficient, and more affordable. For this reliance, he has suffered substantial and irreparable economic harm.

119. In the event this court finds no fraud, the misrepresentations by Defendant Channing were negligent, as he was "sitting on the truth" the entire time they were made in the form of the IP evidence that would form the basis of the Mottershead Report, and ignored multiple notifications of same.

120. For Defendants' conduct as set forth hereinabove, Plaintiff is entitled to relief under the Pennsylvania common-law tort of fraudulent misrepresentation, and states his claim for relief on this basis. Alternatively, he states a claim for negligent misrepresentation and incorporates in that claim, any claims for promissory estoppel/detrimental reliance.

121. Plaintiff is entitled to the entirety of the relief set forth in Count I for this count.

## COUNTS V-VI: GROSS AND SIMPLE NEGLIGENCE AGAINST ALL DEFENDANTS

122. Plaintiff incorporates by reference, verbatim, the contents of paragraphs 1-121.

123. Even if they Defendants did not know of the harm to Plaintiff, and did not conspire against him, they were grossly negligent for refusing to investigate the claims by Board member Defendant Sloan that an imposter had run amok, and for demanding Plaintiff make an impossible proof of innocence (i.e., that he was not posting untraceably) while they could have easily proven his innocence by performing the same work as Mottershead later on.

124. According to the full Mottershead Report, at least two of the imposter's postings were made from a RoadRunner ISP that could have been matched "like a fingerprint" via IP

address to Defendants House of Truong's imposter postings to USENET. Beyond that "smoking gun" evidence, the evidence available during all relevant times was more than sufficient to implicate Truong, had anyone bothered to look for it (assuming they didn't know).

125. Defendants wantonly, willfully, and with depraved indifference to the well-being of Plaintiff, ignored their legal duty to Plaintiff, as well as themselves, Defendant USCF's membership and female employees who were targeted with sexual harassment, and their insurer, to investigate the claims made by Defendant Sloan regarding the imposter in July 2006, even more so after Defendants House of Truong were elected to the Board in July 2007.

126. As a direct and proximate result of Defendants' negligence, Plaintiff has suffered irreparable harm in a form identical to that set forth in Counts III-IV.

127. Alternative to Plaintiff's claims based on conspiracy to defraud its insurer, the conspiracy to harm Plaintiff (and Defendant Sloan), and any other conspiratorial or intentional conduct, he states these claims for relief on the basis of gross negligence, and simple negligence, respectively.

128. Plaintiff is entitled to the entirety of the relief set forth in Counts I and other duplicate-relief counts for this count.

## COUNTS VII-IX: TITLE VII AND PHRA RETALIATION DISCRIMINATION  AGAINST DEFENDANTS USCF AND CHANNING

129. Plaintiff incorporates by reference, verbatim, the contents of paragraphs 1-128.

130. Plaintiff avers, on information and belief, that the true nature of his injury was not discovered until publication of the Mottershead Report.

131. Plaintiff avers, on the basis of delayed discovery of injury due to fraudulent concealment, an equitable tolling of his EEOC claims relating to his November 2006 EEOC charge, in an amount of time sufficient to make his federal gender claim timely, and has

therefore properly exhausted his administrative remedies. Alternatively, he requests a stay on this claim until he can file a new charge based on the new injury discovery.

132. Plaintiff's state-law administrative remedies were exhausted when he attempted to file with the city's PCRH, and the state's PHRC (through dual-filing with EEOC). All three agencies refused (PHRC would have refused) the state-law claims because Defendants USCF et al. in the charge did not have a presence in the Commonwealth, even if its courts have jurisdiction over the Defendants. The EEOC transferred the charge to Nashville,TN. Plaintiff's state-law remedies have therefore been exhausted. This court should also note that the PHRA has an extremely long timetable, and that had the EEOC charge been properly dual-filed, Plaintiff's right to sue under the PHRA would not expire for at least another year, if not two.

133. Plaintiff avers, on information and belief, and a temporal proximity that would be the envy of even Pavlov, that the imposter was motivated primarily, and at first, exclusively, by a retaliatory animus towards Plaintiff. Indeed, the e-mail grievance to Defendant Channing just prior to the impersonation constitutes relevant temporal proximity (below three months), as does the entire timing of the imposter's pattern of attack against Plaintiff. The additional election-campaign purpose later adopted was simply efficient utilization of criminal conduct.

134. As a multitude of crimes were committed, and other torts violated, that the conduct set forth in this Complaint was materially adverse is self-evident. Plaintiff has ample standing to file several criminal complaints against multiple defendants.

135. During all relevant times, Defendant had the minimum staff to ensure standing.

136. As a direct and proximate consequence of Defendants' conduct, Plaintiff has suffered irreparable harm, including but not limited to the loss of past, present, and future income, accumulated wealth, loss of enjoyment of life, loss of professional and personal

reputation, and loss of professional advancement.  Due to age, and his limited training window,

Plaintiff has further suffered the likely loss of his full chess potential and any resulting income

thereto.

137.  Defendants' intentional conduct, as set forth in these counts, entitle him to relief

under the retaliations provision of Title VII (42 USC §2000e-3 *et seq*.) and PHRA, and the

common-law tort of failure to hire against the public interest, and states these claims for relief on

that basis.  Defendant Channing is liable because he directed the imposter's conduct, while

USCF is liable under the theory of respondeat superior, and because Defendant Channing, at the

relevant times, was an officer of Defendant USCF.

138.  For these claims, Plaintiff is entitled to relief identical to that set forth in Count I

and other duplicate-relief counts (compensatory/punitive damages/fees/injunctive etc.).

## COUNT X: LANHAM ACT VIOLATIONS

139.  Plaintiff incorporates by reference, verbatim, the contents of paragraphs 1-138.

140.  Plaintiff is a lifelong chessplayer, whose USCF rating peaked at 2000 (Expert) in

1988 or 1989.  He coached a local high school as a volunteer for half a season in 1989, its first,

leading the rookie team of four beginners and a 1400-rated top board from an 0-3 midseason

record to a 5-5 finish, capped off by a 9-1, two-match victory over Washington High, the third-

strongest school in their league at the time.  Most of the victories were in twenty moves or less

due to Plaintiff's squad's lopsided advantage in the opening.  Prior to this, Plaintiff had defeated

Washington's top board, 2271-rated Elvin Wilson, as black in less than twenty-five moves, what

is called a "miniature" in chess.

141.  Due to the imposter's conduct, it became impossible for Plaintiff to market

himself to the chess world under his own name, which is tied to his rating and all of his pre-

44

internet chess achievements which, while minor by international standards, include a drawn game to tie for first place in a quad against 2549-rated Asa Hoffman, and a near-win in twenty moves against 2508-rated Anatoly Volovich, where Plaintiff was winning easily the entire game prior to losing on time. That game was published in the August 1990 *Chess Life*.

142. Since his return to training in 2004, Plaintiff has been working on a chess e-book and companion chess opening "book database" called ***The Fine Art Of The Miniature: How To Win Your Chessgames In Twenty-Five Moves Or Less***. The book contains Plaintiff's entire opening repertoire, and nine chapters were finished, on several major openings.

143. Plaintiff's skill in the chess opening is such that even against grandmaster competition, it is nearly impossible for Plaintiff's opponents to consistently obtain even a small advantage against him (according to chess computers) in fewer than fifteen moves. (What happens afterwards is why Plaintiff is rated 2000 and not 2700). Plaintiff's playing strength in the opening and his theoretical knowledge of same equals or exceeds that of the typical chess coach, including the House of Truong.

144. Defendant USCF is a publisher of chess books and chess database products, and in direct competition with Plaintiff for that market.

145. Defendants House of Truong and Susan Polgar Foundation are providers of instructional chess products and services, including training in the opening phase of chess, training products, and instructing talented youth, which Plaintiff also specializes in.

146. Absent Defendants' conduct, as set forth in this complaint, Plaintiff would be earning substantial and recurring revenue from his new work. He would have more chess students, would have sold more books, and would have been able to use his name and hard-earned "official USCF Expert Rated" [at peak] status to build a thriving chess-related business

45

and income.  He might even have been able to win some tournaments as an extension of that lifestyle.

147.  Plaintiff avers, on information and belief, including but not limited to the facts set forth in this complaint, a pecuniary, competitive and irreparable harm directly attributable to Defendants' conduct, and which would not exist but for that conduct.

148.  Plaintiff is entitled to relief under the misleading-promotional-statement provision and – obviously – false-designation-of-origins provision of Lanham Act, and states this claim for relief on that basis.  Alternatively, if the Lanham Act does not apply, he is entitled to leave of the court (on equal-acess grounds because he is *pro se*) to file equivalent state-law claims, to the extent they would offer remedy.

149.  Plaintiff is entitled to compensatory and punitive damages, attorney fees, costs of suit, temporary and permanent injunctive relief sufficient to terminate the actionable conduct, and such other relief as this court deems just and proper.

## COUNT XI: CIVIL CONSPIRACY

150.  Plaintiff incorporates by reference, verbatim, the contents of paragraphs 1-149.

151.  Plaintiff avers, on information and belief, that all, or nearly all, actionable conduct relevant to this claim was engaged in by agreement between the Defendants, with agreement initiated jointly by Defendants Channing and House of Truong.

152.  As two or more individuals have conspired to violate torts of the Commonwealth for which Plaintiff has standing to sue individually, he has further standing to sue under the tort of civil conspiracy, and states this claim for relief on that basis.

153.  Plaintiff is entitled to compensatory and punitive damages, attorney fees, costs of suit, temporary and permanent injunctive relief sufficient to terminate the actionable conduct,

and such other relief as this court deems just and proper.

## COUNT XII: RICO CONSPIRACY

154. Plaintiff incorporates by reference, verbatim, the contents of paragraphs 1-153.

155. The RICO enterprise is a) Defendant USCF; b) Defendant Susan Polgar Foundation; or c) an association-in-fact enterprise, with apologies to the court for the layman's language. This is also a large chunk of Plaintiff's known witness list:

| Actor/Other | Character/Other |
|---|---|
| Defendant Goichberg | Anthony "Tony" Soprano, Sr. |
| Defendant Channing | Silvio "Syl" Dante |
| Defendant Truong | Christopher "Kwistopha" Moltisanti |
| Defendant Polgar | Adriana "Ade" La Cerva |
| Defendant Sloan | Paul "Paulie Walnuts" Gualtieri |
| Defendants CCA | The Bada Bing |
| Defendant SPF | Arty's Restaurant |
| Defendant USCF | Tony's "legit" employer |
| Randy Bauer (unnamed co-conspirator) | Phil Leotardo |
| Jim Berry (unnamed co-conspirator) | Anthony "Tony B." Blundetto |
| Bill Hall (unnamed co-conspirator) | Corrado "Uncle Junior" Soprano |

And, as the law-abiding victims and others:

| | |
|---|---|
| Brian Mottershead | Agent Harris |
| Jennifer Shahade | Meadow Soprano |
| Greg Shahade | Anthony "A.J." Soprano, Jr. |
| Beatriz Marinello | Janice Soprano |
| Gata Kamsky | Russian guy from Pine Barrens |

156. Predicate acts for the "family" include a separate predicate act for each imposter posting to USENET, as Defendant Channing's role in their creation constitute, for each posting, a separate violation of Florida's criminal-libel statute (and by extension, 18 USC §1961(1)). Florida's criminal-libel statute carries a penalty of two years of incarceration, and is therefore a predicate RICO statute.

157. Other predicate acts include violations of the Sarbanes-Oxley Act, for retaliation

against Mr. Mottershead and Brian Lafferty, in the form of interference with their liveliehoods (law practice and computer work, respectively), in retaliation for their sending the Mottershead Report to two United States Attorney Generals (MA and TN), in clear violation of RICO-predicate statute 18 USC §1513(e), and by extension, 18 USC §1961(1).

158. Although Plaintiff is not well-versed in insurance law, as a betting man, he would lay strong odds that a number of predicate acts related to the insurance scam, particularly criminal fraud, are also predicate acts.

159. Plaintiff avers, on information and belief, that the Goichberg "family" has been in operation for longer than twelve months, and has targeted multiple victims, without restraint and every time it has perceived the need to.

160. Plaintiff avers, on information and belief, that Defendants have invested their illgotten gains directly attributable to the predicate acts towards the furtherance of the enterprise through commission of additional predicate acts, in violation of 18 USC §1962(a).

161. Plaintiff avers, on information and belief, that, excepting Defendant USCF (the RICO enterprise), defendants have, through the pattern of racketeering activity set forth in this complaint (thousands of predicate acts), acquired and maintained control of Defendant USCF, the RICO enterprise, in violation of 18 USC §1962(b).

162. Plaintiff avers, on information and belief, that each defendant has committed, or conspired to commit, at least two predicate acts in furtherance of the RICO enterprise, in violation of 18 USC §1962(c).

163. The RICO enterprise has violated each of 18 USC 1964(d), and has therefore also violated 18 USC §1962(d). Other nonpredicate acts in furtherance of the enterprise constitute additional violations of 18 USC §1962(d).

164. As a direct and proximate consequence of the RICO enterprise, Plaintiff has suffered irreparable pecuniary harm, in the form of lost past, present and future income in his employment and business, normal pain and suffering (not the "Rule 35" variety), and has been effectively "blacklisted" by many in power in organized American chess. As youth is an asset in chess, his tournament career has likely suffered a fatal blow as far as reaching his natural peak.

165. For the violations of 18 USC §1962(d) set forth, Plaintiff is entitled to relief under 18 USC §1964(c).

166. Plaintiff is entitled to compensatory and punitive damages, attorney fees, costs of suit, temporary and permanent injunctive relief sufficient to terminate the actionable conduct, and such other relief as this court deems just and proper.

167. Plaintiff is further entitled to injunctive relief which places USCF into a receivership, removes the Executive Board, freezes its assets and operations except where allowed by the court, and appoints a trustee to operate it. This should occur immediately because, if it does not, further preventable and irreparable harm will occur.

## **PRAYER FOR RELIEF**

Plaintiff is entitled to the following relief, in amounts to be determined at trial, apportioned among the defendants as also to be determined at trial. Relief is sought from all defendants where all defendants are listed for a claim. Where all defendants are not listed for any claim, no relief is sought from the nonlisted defendants for that claim.

1. For the employment claims, unspecified compensatory and punitive damages in an amount greater than ONE MILLION DOLLARS.

2. For all other claims, ONE HUNDRED MILLION DOLLARS.

3. A temporary injunction prohibiting, until further order, any defendant from directly contacting Plaintiff except by e-mail to his AOL address listed in this Complaint, and requiring them to

remain at least one hundred (100) feet from Plaintiff at all times.

       4.     A temporary and permanent injunction placing Defendant USCF into receivership, under the direction of a court-ordered trustee.

       5.     A permanent injunction removing Defendant USCF's Executive Board from its positions on the Board.

       6.     Injunctive relief sufficient to terminate the actionable conduct and prevent any recurrence.

       7.     Such other relief as this court deems just and proper.

This the 20th day of February, 2008.


Gordon Roy Parker
4247 Locust Street, #119
Philadelphia, PA  19104
(215) 764-5487
E-mail: GordonRoyParker@aol.com
Plaintiff, Pro Se

50

# IN THE UNITED STATES DISTRICT COURT
## FOR EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GORDON ROY PARKER**, a/k/a "Ray Gordon" a/k/a "Ray Gordon, Creator Of The Pivot," d/b/a Snodgrass Publishing Group,<br><br>                              Plaintiff<br>                    v.<br><br>**Samuel H. Sloan** et al.,<br><br>                              Defendants | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | **CASE NO.:** |

## VERIFICATION

I, Gordon Roy Parker, **Plaintiff** in the above-styled action, hereby attest and swear, under penalty of perjury, including but not limited to 28 USC §1746, and all other federal, state, and local laws relating to making false sworn or unsworn statements, that all factual averments in the preceding **Complaint** are true and correct to the best of my current knowledge and belief, by standard of preponderance of the evidence available to me at the time of averment.


02/20/2008
Date


Gordon Roy Parker
4247 Locust Street, #119
Philadelphia, PA  19104
(215) 764-5487
E-mail: GordonRoyParker@aol.com
Plaintiff, Pro Se